**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MD SPINE SOLUTIONS, LLC d/b/a MD LABS, | |
| Plaintiff, | Civil Action No.: 1:21-cv-3435 |
| v. | |
| UNITEDHEALTH GROUP, INC., OPTUM, INC., UNITED HEALTHCARE INSURANCE COMPANY, UNITED HEALTHCARE SERVICES, INC., UNITED HEALTHCARE INSURANCE COMPANY OF THE RIVER VALLEY, UNITEDHEALTHCARE SERVICES COMPANY OF THE RIVER VALLEY, INC., and UNITEDHEALTHCARE PLAN OF THE RIVER VALLEY, INC., | **Jury Trial Demanded** |
| Defendant. | |

## COMPLAINT AND JURY DEMAND

Plaintiff MD Spine Solutions d/b/a MD Labs ("MD Labs"), by and through counsel, complains against Defendants UnitedHealth Group, Inc., Optum, Inc., United Healthcare Insurance Company, United Healthcare Services, Inc., United Healthcare Insurance Company of the River Valley, UnitedHealthcare Services Company of the River Valley, Inc., and UnitedHealthcare Plan of the River Valley, Inc. (collectively, "UHC" or "Defendants"), and in support of its claims, asserts as follows:

## NATURE OF THE CLAIMS

1.      This case is about UHC wrongfully denying MD Labs over $1 million in payment for medically necessary services that MD Labs provided to UHC members.

2.      UHC is the nation's largest provider of private health insurance, reporting hundreds of billions of dollars in annual revenue. In 2019 alone, UHC reported roughly $242.2 billion dollars in revenue, up from $226.2 billion the year before.

3.     UHC provides health insurance plans that cover millions of individuals (known as plan members) in the United States. Many members obtain health insurance through plans sponsored by their private employers. UHC also provides health insurance coverage, approved by the government, to members eligible for Medicare benefits through a program known as Medicare Advantage. And UHC provides health insurance coverage to members eligible for Medicaid through plans associated with various states.

4.     MD Labs is a medical laboratory services provider. MD Labs has a contract to provide health care services to UHC members who have certain employer-provided plans. But MD Labs does not have a contract to provide health care services to UHC members with Medicare Advantage or Medicaid-related plans. So for UHC members with Medicare Advantage or Medicaid-related plans, MD Labs is considered an "out-of-network" provider.

5.     As a general rule, the terms of UHC health insurance plans—including employer-provided, Medicare Advantage, and Medicaid-related plans—allow members to receive health care services from both "network" and "out-of-network" providers. That right—to obtain services from out-of-network providers—is especially important when, as here, out-of-network medical service providers like MD Labs offer superior or specialized laboratory services that improve patient care and may not be available from network providers, or when physicians decide, based on their experience and best medical judgment, that using an out-of-network medical service provider like MD Labs best serves the patient.

6.     Despite UHC's obligations under the plans and member-patients' right to receive services from providers like MD Labs, UHC has now issued after-the-fact denials of many of MD Labs' claims irrespective of the medically necessary services MD Labs provided, the ordering physicians' judgment that the patients needed the testing MD Labs performed, and the fact that

plan sponsors have negotiated and paid UHC for that benefit. To the contrary, by collecting payments from plan sponsors and members but refusing to pay for legitimate, medically necessary claims, UHC pockets payments while substantially cutting its costs.

7.    Specifically in this case, UHC is attempting to wrongfully pocket more than $1 million in profits by unjustifiably denying, based on two small audits (collectively, the "Audits"), previously approved and previously paid valid claims for medically necessary services that MD Labs provided to UHC members, purporting to "project" those low-dollar-value audit findings to the entire universe of claims through statistically invalid methods, and then using that invalid projection as justification for "recouping"—i.e., refusing to pay—$1,032,455.04 from later, unrelated, and admittedly valid claims.

8.    UHC has already "recouped" approximately $1 million so far by denying MD Labs payment for later, unrelated, and admittedly valid claims.

9.    Prior to the Audits, the system worked as it should: a physician, in consultation with his or her patient, would order testing from MD Labs; the patient permitted their insurance benefits to be paid directly to MD Labs; MD Labs performed the test and reported the results to the physician; UHC was then billed for the services and paid as required under law.

10.    In or around February 2019, however, UHC conducted the first of the two sample Audits that are the subject of this Complaint: Audit No. 20524980. This audit reviewed a small number of UnitedHealthcare Community Plan of Tennessee claims paid from 07/11/2015-06/09/2017. This Plan corresponds to UHC's Medicare Advantage product lines in Tennessee.

11.    In or around November 2019, UHC conducted the second sample audit: Audit No. 13198321. This audit reviewed a small number of UnitedHealthcare Community Plan of

Tennessee claims paid from 07/08/2015-06/09/2017. This Plan corresponds to UHC's Medicare Advantage and Medicaid product lines in Tennessee.

12.     In both Audits, UHC suddenly found that the documentation submitted by MD Labs many years prior did not support the services billed for many of the sampled claims, even though UHC had previously reviewed, approved, and paid all the claims shortly after MD Labs initially submitted them. The reasons UHC gives for its years-after-the-fact denials are generic, vague, and appear to be largely cut-and-pasted across all claims. The reasons UHC offers also do not actually justify denying the claims.

13.     All sampled claims were for medically necessary services that MD Labs properly rendered to patients after receiving orders that manifested the physician's intent to order that lab testing. UHC confirmed this when it initially reviewed the audited claims and paid for them as covered patient services. Despite this, UHC now asserts the audited claims should not have been paid, and that all money UHC paid for those claims constitutes overpayments that MD Labs must now pay back to UHC.

14.     Even more egregiously, UHC grossly inflated its invalid audit findings by purporting to "project" its findings from only 30 records, using statistically invalid methods, to the entire universe of claims that MD Labs made for services to members of the relevant UHC plans during the approximately 2-year audit time frames.

15.     For Audit No. 20524980, UHC reviewed 30 UnitedHealthcare Community Plan records and purported to find an overpayment of $24,877.92. But UHC then claimed to "project" those findings to the entire universe of claims from a nearly two-year period, even though UHC admits that the audit sample is too small to be statistically valid. Based on this so-called

"projection," UHC now claims that MD Labs owes UHC $728,030.04 as a result of this small sample audit.

16.     For Audit No. 13198321, UHC reviewed a sample 30 UnitedHealthcare Community Plan records and purported to find an overpayment of $8,206.14. But UHC then claimed to "project" those findings to the entire universe of claims from a nearly two-year period, even though UHC admits that the initial sample was too small to be statistically valid. Based on this so-called "projection," UHC now claims that MD Labs owes UHC $304,425.00 as a result of this small audit.

17.     UHC's "projections" are statistically invalid and act to even further inflate the amount by which UHC is unlawfully denying MD Labs payment for medically necessary services rendered to UHC members.

18.     In addition to the initial sample being too small, UHC's method of projecting the alleged error rate onto the entire universe of claims is also statistically invalid and violates UHC policies and CMS rules. Under section 8.4.5.1 of the CMS Medicare Program Integrity Manual, auditors should use "the lower limit of a one-sided 90 percent confidence interval . . . as the amount of overpayment to be demanded for recovery."[1] This method of extrapolation is designed to ensure that auditors do not overcalculate an overpayment, because recouping more than was initially overpaid would illegally deprive providers of payment they have rightfully earned. But UHC's Audits do not use the lower limit of a 90 percent confidence interval. In fact, UHC has not disclosed a confidence interval or level of precision at all, despite MD Labs' requests that UHC disclose this information.

---

[1] The CMS Medicare Program Integrity Manual is available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/pim83c08.pdf.

19.     In fact, MD Labs repeatedly requested that UHC provide MD Labs with its audit workpapers to illustrate the Audits' sampling methodology, universe, sample frame, projection method, confidence intervals and levels of precision UHC used to calculate the projected overpayment amount, and other basic information. Despite MD Labs' requests—and despite the fact that section 8.4.4.5 of the Medicare Program Integrity Manual requires auditors to maintain all documentation pertinent to an estimated overpayment—UHC has repeatedly refused to disclose its audit workpapers and has failed to provide even the most basic information about the Audits, including the universe of claims from which the "samples" were selected and the universe onto which UHC's deficient findings were "projected."

20.     Because UHC's audit findings are incorrect and UHC's method of "projecting" those audit findings is statistically invalid, MD Labs timely appealed both Audits and demanded that UHC cease recoupment.

21.     UHC denied both of MD Labs' appeals without further meaningful analysis or explanation.

22.     Based on its inaccurate audit findings, UHC recouped more than $1,000,000 from later-filed valid claims, even though MD Labs disputed and continues to dispute those findings.

23.     UHC recouped based on its statistically invalid "projections" even though MD Labs pointed out in its appeals that UHC's audit samples are too small to support extrapolation and that the methods UHC used to perform its "projections" are invalid.

24.     And UHC recouped based on these inaccurate audit findings and statistically invalid "projections" even while MD Labs' appeals were pending, even though MD Labs requested that UHC cease recoupment until MD Labs' appeal of the audit findings and its concerns regarding UHC's invalid sampling and "projection" methods were resolved.

25.     MD Labs has exhausted all available administrative review processes. MD Labs appealed the findings associated with both Audits. In both appeals, MD Labs pointed out that UHC's reasons for denying the sampled claims were invalid, explained the errors in UHC's sampling and extrapolation methodology, and requested that UHC give MD Labs its audit workpapers. UHC responded by ignoring MD Labs' concerns, upholding the original audit findings without further meaningful analysis or explanation, and refusing to produce UHC's audit workpapers. UHC offered no further recourse or opportunities for appeal, and UHC apprised MD Labs of no other means of handling this dispute administratively. In the meantime, UHC has continued to "recoup" by withholding payment for admittedly valid claims from MD Labs, despite MD Labs' repeated objections. These actions by UHC leave MD Labs with no other way to defend its right to payment than through filing a lawsuit in court.

26.     By filing this lawsuit, MD Labs seeks to reverse UHC's unlawful "recoupment" by recovering payment for the medically necessary services that MD Labs provided to patients insured by UHC. Furthermore, MD Labs seeks to obtain any other remedy (punitive, injunctive, and otherwise) that this Court deems fair and appropriate under the law and facts of this case.

## PARTIES, JURISDICTION, AND VENUE

27.     Plaintiff MD Labs is a California limited liability company with its principal place of business in Reno, Nevada. Its members are domiciled in California and Nevada.

28.     Upon information and belief, Defendant UnitedHealth Group, Inc. ("UHG") is a Delaware corporation with its principle place of business in Minnetonka, Minnesota. UHG issues and administers health insurance plans across the United States through its wholly-owned and controlled subsidiaries, including but not limited to the other Defendants named below.

29.     Upon information and belief, Defendant Optum, Inc. ("Optum") is a Delaware corporation with its principle place of business in Eden Prairie, Minnesota.

30.     Upon information and belief, Defendant UnitedHealthcare Insurance Company ("UHI") is a Connecticut corporation with its principle place of business in Hartford, Connecticut.

31.     Upon information and belief, Defendant United Healthcare Services, Inc. ("UHS") is a Minnesota corporation with its principle place of business in Minnetonka, Minnesota.

32.     Upon information and belief, Defendant United Healthcare Insurance Company of the River Valley ("UHI RV") is an Illinois corporation with its principle place of business in Moline, Illinois.

33.     Upon information and belief, Defendant UnitedHealthcare Services Company of the River Valley, Inc. ("UHS RV") is a Delaware corporation with its principle place of business in Moline, Illinois.

34.     Upon information and belief, Defendant UnitedHealthcare Plan of the River Valley, Inc. ("UHP RV") is an Illinois corporation with its principle place of business in Moline, Illinois. Upon information and belief, UHP RV does business as United Healthcare Community Plan (TN) and directly administers the plans subject to the audits described in this complaint.

35.     Collectively, United HealthGroup, Inc., Optum, Inc., UnitedHealthcare Insurance Company, United Healthcare Services, Inc., United Healthcare Insurance Company of the River Valley, UnitedHealthcare Services Company of the River Valley, Inc., and UnitedHealthcare Plan of the River Valley, Inc. shall be referred to as "UHC" or "Defendants" in this Complaint. Upon information and belief, Defendants are related entities that use employees interchangeably, and all played a role in initiating, conducting, and/or recouping based on the audits described in this Complaint.

36.     This Court has personal jurisdiction over Defendants. Each Defendant conducts substantial business in the State of Illinois and/or otherwise possesses sufficient minimum contacts with this State.

37.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a). Upon information and belief, there is complete diversity of citizenship between the parties, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

38.     This Court may exercise supplemental jurisdiction over MD Labs' state law claims pursuant to 28 U.S.C. § 1367.

39.     Venue in the Northern District of Illinois is proper under 28 U.S.C. § 1391(b)(1). All defendants are subject to personal jurisdiction within the State of Illinois, and at least one defendant resides in the Northern District of Illinois under 28 U.S.C. § 1391(d) because it conducts substantial business and/or otherwise possesses sufficient minimum contacts there.

## STATEMENT OF FACTS

**A.     MD Labs Provides Medically Necessary Laboratory Services that Benefit Physicians and Patients.**

40.     MD Labs is a prescription monitoring toxicology company. Its specialized laboratory services are used by physicians nationwide to monitor prescription adherence, assist patients with pain management, monitor patients recovering from drug use, and aid in the diagnosis and treatment of urinary tract and sexually transmitted infections.

41.     Traditional urinalysis often fails to adequately capture a patient's prescription adherence and drug use. MD Labs provides traditional testing as well as advanced technologies designed to identify the presence and levels of drugs and other organic chemical compounds with the highest precision and accuracy. For example, MD Labs is one of the very few laboratories with the ability to separate and identify illegal dextromethamphetamine from levomethamphetamine, a

mirror enantiomer found in Vick's Vapor Inhaler, selegiline, and other legal medications. Only very sensitive equipment and select methods like those used by MD Labs can differentiate and quantify these two drugs from each other. MD Labs' specialized equipment also allows it to identify a broader range of organisms causing polymicrobial urinary tract infections than traditional urine cultures and to test for antibiotic resistance among those organisms.

**B.      MD Labs Provided and Continues to Provide Medically Necessary Testing for Members of UHC's Plans.**

42.      As noted above, UHC provides health insurance plans that cover millions of members in the United States. This includes plans sponsored by private employers, Medicare Advantage plans approved by the government that cover members eligible for Medicare coverage, and plans that cover members eligible for Medicaid in various states including Tennessee.

43.      When a UHC member receives medically necessary health care services from either a "network" or "out-of-network" provider that is covered by one of the plans, UHC must pay for the services.

44.      MD Labs is not under contract with UHC with respect to its Medicare and Medicaid related plans like those corresponding to the Audits and is thus an "out-of-network" provider with respect to such plans.

45.      Notwithstanding that MD Labs is an out-of-network provider with respect to the audited UHC plans, MD Labs been requested to perform and has routinely performed laboratory services for thousands of members of UHC's Medicare- and Medicaid-related plans over the past several years.

46.      During that period and up through the present, the procedures used by MD Labs to process laboratory services and submit claims to UHC for reimbursement have remained

essentially the same and are consistent with customary industry practices for out-of-network providers.

47.     MD Labs, as a service provider, is mandated to and does follow the physician's instructions. If a physician determines that a laboratory test offered by MD Labs is medically necessary in the physician's treatment or evaluation of his or her patient, that physician will complete a physical or electronic order form specifying the test(s) to be ordered.

48.     Once completed, the order form and the member's sample are sent to MD Labs. Upon receipt, MD Labs follows the physician's instructions and conducts only those tests ordered, provides the results to the ordering physician for use in treating the patient as the physician deems appropriate based on his or her independent medical judgment, and submits a claim to UHC on appropriate billing forms for payment.

49.     For the claims at issue in this case, MD Labs has the right to collect payment from UHC, MD Labs provided medically necessary services requested by the ordering physician, and MD Labs timely submitted the claims to UHC for reimbursement. UHC confirmed all of this when it initially reviewed, approved, and paid claims.

**C.     Years After Paying MD Labs for Medically Necessary Services, UHC Suddenly and Unjustifiably Declared the Claims Invalid.**

50.     The Audits appears to concern claims MD Labs began submitting shortly before July 2015, and UHC reviewed, approved, and paid all the claims in the second half of 2015, 2016, and the first half of 2017. The number of claims that UHC initially paid but then subjected to these years-after-the-fact Audits is significant.

51.     By initially paying for these claims shortly after MD Labs submitted them, UHC confirmed that the claims were for medically necessary laboratory services and, therefore, covered by the applicable plans. In other words, the process worked as it was designed.

52.     However, UHC's desire to maintain high profit margins interrupted the process. In or around February 2019, UHC conducted the first of the two small sample Audits subject to this Complaint: Audit No. 20524980. As a part of that audit, UHC claims to have reviewed 30 UnitedHealthcare Community Plan member records comprising 514 claim lines paid between 07/08/2015 and 06/07/2017. And even though UHC previously reviewed, approved, and paid all of these claim lines years ago, UHC now suddenly asserts that 77% of the sampled claims—totaling $24,877.92—were not valid and need to be repaid to UHC.

53.     In or around November 2019, UHC conducted the second of the two small sample Audits subject to this Complaint: Audit No. 13198321. As a part of that audit, UHC claims to have reviewed 30 UnitedHealthcare Community Plan records comprising 541 claim lines paid between 07/11/2015 and 06/09/2017. And even though UHC previously reviewed, approved, and paid all of these claim lines years ago, UHC now suddenly asserts that 100% of the claims—totaling $8,206.14—were not valid and need to be repaid to UHC.

54.     UHC's explanations for its years-after-the-fact denials in both Audits are generic, vague, and appear to be largely cut-and-pasted across all claims.

55.     For instance, even though MD Labs submitted the very same supporting paperwork for the Audits that UHC previously accepted and processed to pay for MD Labs' services, UHC suddenly asserts that the information submitted by MD Labs is insufficient to support the services billed. UHC is incorrect.

56.     All claims were for medically necessary services that MD Labs properly rendered to patients. MD Labs performed these services for patients after receiving valid physicians' orders for those services. The orders all identify the ordering physician in a clear and verifiable way and indicate which tests the physician is ordering. And there is no dispute that the ordering providers

indeed ordered the tests performed and that MD Labs did in fact perform the services for which it billed.

57.     UHC's ostensible bases for denying claims lack merit. UHC apparently denied claims on the ostensible basis that they lacked a signed physician order, but the orders at issue are sufficient to validate the physician's intent to order testing. Federal regulations do not require a physician's signature on a lab order to satisfy the requirement that the treating physician order testing[2], and UHC's policies similarly do not require a signed physician's order for a laboratory service claim to be valid[3]. Instead, both federal rules and UHC policies simply require evidence of a physician's intent to order, and that requirement can be satisfied even without a physician's signature. For example, the physician intent to order requirement can be satisfied by submitting an unsigned order together with authenticated medical records supporting the physician's intent to order testing (even if the records do not list the specific tests to be ordered), or by submitting an authenticated medical record supporting the physician's intent to order specific tests.[4]

58.     The documents MD Labs received from physicians manifest the physicians' intent to order the designated lab testing that MD Labs carried out for patients. UHC confirmed this when it initially reviewed the submitted claims and paid for them as covered patient services.

59.     Another ostensible basis for almost all denied claims is that the "service is not reimbursable for this provider in this place of service." The Audits fail to explain why this is a basis to disallow payment to MD Labs for the services in question. According to the Audits and UHC's Laboratory Services Policy, the Place of Service is the place where the specimen is drawn,

---

[2] *See* CMS Medicare Program Integrity Manual §§ 6.9.1, 3.3.2.4
[3] *See Id.* §§ 6.9.1, 3.3.2.4; United Healthcare Laboratory Services Policy for Medicare Advantage Plans at pp. 4, 10 (simply requiring evidence of the physician's "order/intent to order"), available at https://www.uhcprovider.com/content/dam/provider/docs/public/policies/medadv-reimbursement/MEDADV-Laboratory-Services-Policy.pdf.
[4] United Healthcare Laboratory Services Policy for Medicare Advantage Plans at pp. 4, 10.

which for MD Labs' patients is typically in the physician's office. Nothing in UHC's Laboratory Services Policy (or any other UHC policy) states laboratory services are non-reimbursable if the specimen is drawn at the physician's office. But UHC justifies denying many of the sample claims in the audit by pointing to Place of Service anyway.

60.     Yet another invalid explanation UHC offers for denying some of the claims in Audit No. 20524980 is that MD Labs used the wrong billing code. This is again incorrect, because the documentation for each claim supports the code MD Labs used. For example, the Audits denied several claims for HCPCS code G0483 (definitive drug testing for 22+ drug classes) because the Audits found that HCPCS code G0482 (definitive drug testing for 15-21 drug classes) should have been used instead. But MD labs properly calculated the number of drug classes tested based on how drug classes are listed and categorized by CMS.[5] This listing of drug classes is also consistent with the definitive drug class listing provided in the 2016 American Medical Association's CPT guidelines.

61.     MD Labs raised the issues described in paragraph 60 above regarding UHC's billing code findings in its appeal of Audit No. 20524980. UHC entirely ignored the issues MD Labs raised and upheld its original findings without any further analysis or explanation.

**D.     UHC Drastically Expounded its Incorrect Audit Findings by "Projecting" Those Findings onto the Entire Audited Universes Using Statistically Invalid Methods.**

62.     Compounding its errors in retrospectively denying claims in the Audit samples, UHC grossly inflated its invalid audit findings by purporting to "project" those findings onto the entire universe of claims over a nearly two-year period using statistically invalid methods. UHC's

---

[5] *See* Calendar Year (CY) 2016 Clinical Laboratory Fee Schedule Final Determinations, at p. 2 (the most recent listing of drug classes provided by CMS).

inaccurate and invalid projections grossly amplify the amount that UHC recouped and, correspondingly, the amount by which UHC is unjustly enriched at MD Labs' expense.

63.     For Audit No. 20524980, UHC reviewed 30 UnitedHealthcare Community Plan member records and purported to find an overpayment of $24,877.92. UHC alleges that this constitutes an error rate of 77% and demands that MD Labs pay back 77% of *all* claims MD Labs made within the 2-year universe that UHC sampled from. Based on this invalid "projection," UHC now claims that MD Labs owes UHC $728,030.04, almost *thirty* times as much, based on this small audit.

64.     For Audit No. 13198321, UHC reviewed 30 UnitedHealthcare Community Plan records and purported to find an overpayment of $8,206.14. UHC alleges that this constitutes an error rate of 100% and demands that MD Labs pay back 100% of *all* claims made within the 2-year universe that UHC sampled from. Based on this invalid "projection," UHC now claims that MD Labs owes UHC $304,425.00, more than *thirty-seven* times as much, based on this small audit.

65.     These projections are not statistically valid. To begin with, as UHC admits, the thirty member records reviewed in each audit were too small to constitute a statistically valid random sample of the entire universe of claims. As a result, any attempt to extrapolate from the audit samples to the entire universe of claims is necessarily statistically invalid and inaccurate and in violation of both Centers for Medicare and Medicaid Services ("CMS") rules and UHC policies requiring that any extrapolation be performed only from a statistically valid random sample. *See* CMS Medicare Program Integrity Manual § 8.2.3. But UHC is withholding over $1 million payment from MD Labs based on its so-called "projection" from an admittedly statistically invalid sample anyway.

66. UHC's extrapolation and claimed amounts owed also violate UHC policies and CMS rules. Section 8.4.5.1 of the CMS Medicare Program Integrity Manual directs auditors, when extrapolating from (statistically valid random) samples, to use "the lower limit of a one-sided 90 percent confidence interval . . . as the amount of overpayment to be demanded for recovery" to ensure that auditors do not overcalculate the overpayment, because recouping more than was initially overpaid would illegally deprive providers of payment they have rightfully earned. But UHC's "projections" do not use the lower limit of a 90 percent confidence interval. In fact, UHC has not disclosed a confidence interval or level of precision at all, despite MD Labs' request in its appeal that UHC disclose this information.

67. Rather than using the lower limit of a 90 percent confident interval—let alone *any* limit of *any* confidence interval—it appears that for both Audits UHC claims it is owed the same percent (77% for Audit No. 13198321, 100% for Audit No. 20524980) of all money paid in the universe of claims as was allegedly found in the small sample. In other words, UHC's "projections" *assume a 0% sampling error*, which is mathematically unheard of for even the most robust of statistically valid random samples, let alone the small and statistically invalid sample sizes in the Audits. This assumption is particularly egregious given the audit letters' acknowledgement that the initial sample was not large enough to be considered statistically valid.

68. Even if it were permissible to extrapolate from a statistically invalid sample (which it is not), the small sample size would still have "a direct bearing on the precision of the estimated overpayment", the resulting confidence intervals would be wider, and the lower limit of the 90% interval would be even further below the point estimate. *See* CMS Medicare Program Integrity Manual § 8.4.4.5. The audit's extrapolation methodology fails to account for this or even acknowledge it.

69.     MD Labs repeatedly requested that UHC provide MD Labs with its audit workpapers to illustrate the details of the audit's sampling methodology, universe, sample frame, sample size calculation, the confidence interval and level of precision UHC used to calculate the "projected" overpayment amount, and other basic information. Despite MD Labs' requests—and despite the fact that § 8.4.4.5 of the Medicare Program Integrity Manual requires auditors to maintain all documentation pertinent to an estimated overpayment—UHC refused to disclose its audit workpapers. As a result, MD Labs is left with no idea how UHC selected its sample, how UHC calculated its sample size, what estimates of error and precision UHC used, and what methodology it used to "project"—all information that is critical for determining the appropriateness of the methodology in the first place, much less whether it is statistically valid.

70.     UHC's repeated refusals to provide this basic audit information—which CMS rules require it to maintain—raise serious questions about the accuracy of UHC's sampling and extrapolation.

71.     UHC's refusal to cease recoupment even after MD Labs appealed the audit findings, pointed out the inaccuracy of UHC's sampling and extrapolation methods, and requested the audit workpaper constitutes bad faith on the part of UHC.

72.     MD Labs timely appealed both Audits and demanded that UHC cease recoupment, but UHC denied both appeals without offering any further meaningful analysis or explanation and without offering any further recourse. MD Labs appealed Audit No. 20524980 on February 3, 2020, but UHC denied the appeal on June 29, 2020. UHC's response offered no further administrative process for disputing the audit findings. And MD Labs appealed Audit No. 13198321 on December 16, 2019, but UHC denied the appeal on April 10, 2020. UHC's response offered no further administrative process for disputing the audit findings.

73.     MD Labs has exhausted all administrative remedies. UHC's responses to MD Labs' appeals included no further means of recourse or appeal and did not apprise MD Labs of any other available administrative processes. MD Labs is thus forced to file this action to cease and reverse UHC's unlawful "recoupment" of payment that MD Labs has rightfully earned for medically necessary healthcare services provided to UHC members.

74.     UHC's continued withholding payment from MD Labs based on its inaccurate sample audit and statistically invalid extrapolation from that audit has significantly damaged and continues to significantly damage MD Labs.

## COUNT I
## BREACH OF CONTRACT
### (As Contract Assignees)

75.     MD Labs incorporates by reference the preceding paragraphs.

76.     MD Labs provided medically necessary laboratory services to the patients identified in the denied claims based on valid orders from the patients' physicians.

77.     Under the plans, UHC is obligated to pay or direct payment for medically necessary services, covered services, or covered benefits as defined by the plans.

78.     However, UHC has refused to pay for these services. UHC's failure to pay for the medically necessary services provided by MD Labs to the patients identified in the denied claims constitutes a breach of contract.

79.     The patients identified in the denied claims have assigned MD Labs their insurance plan benefits. As assignee of the beneficiaries of the plans, MD Labs is entitled to recover benefits due to the insured patients and enforce the rights of the insured patients under the terms of the plans.

80.     Without meaningful analysis or explanation, UHC denied MD Labs' appeal of UHC's after-the-fact decision to revoke payment for the denied claims. Therefore, MD Labs is forced to file this action, as it has exhausted administrative remedies.

**COUNT II**
**BREACH OF CONTRACT**
**(As Third-Party Beneficiaries)**

81.     MD Labs incorporates by reference the preceding paragraphs.

82.     MD Labs provided medically necessary laboratory services to the patients identified in the denied claims.

83.     Under the plans, UHC is obligated to pay or direct payment for medically necessary services, covered services, or covered benefits as defined by the plans.

84.     However, UHC has refused to pay for these services. UHC's failure to pay for the medically necessary services provided by MD Labs to the patients identified in the denied claims constitutes a breach of contract.

85.     MD Labs is a third-party beneficiary under the plans, as the intent and purpose of the plans was to pay healthcare service providers for healthcare services provided to the insureds. As a third-party beneficiary of the plans, MD Labs is entitled to recover benefits due to the insured patients and enforce the rights of the insured patients under the terms of the plans.

86.     Without meaningful analysis or explanation, UHC denied MD Labs' appeal of UHC's after-the-fact decision to revoke payment for the denied claims. Therefore, MD Labs is forced to file this action, as it has exhausted UHC's administrative remedies.

**COUNT III**
**UNJUST ENRICHMENT / QUASI-CONTRACT / QUANTUM MERIT**
**(Value of Services Provided)**

87.     MD Labs incorporates by reference the preceding paragraphs.

88.     UHC has been unjustly enriched by MD Labs' provision of medically necessary physician-ordered services for which valid claims were submitted but reimbursement has been recouped. UHC asserts its failure to reimburse MD Labs for admittedly valid, physician-ordered claims is justified because it is "recouping" amounts it paid for the prior MD Labs claims for services in the samples subject to Audit Nos. 20524980 and 13198321. But MD Labs' prior claims reflected in the samples subject to Audit Nos. 20524980 and 13198321 were valid, so UHC has no legitimate basis upon which to now deny these claims.

89.     Even worse, UHC drastically increased the amount by which it was unjustly enriched by purporting to "project" its incorrect audit findings onto the entire universe of claims for the audit periods using statistically invalid and inaccurate methods that violate both CMS rules and UHC policy.

90.     UHC received a benefit by the provision of these services as it collected premiums and other remuneration from its members but was spared the cost of reimbursement to MD Labs.

91.     UHC knows and appreciates the benefit it received, and in fact previously approved and reimbursed for the claims before turning around years after the fact and revoking that approval.

92.     The plans, by their terms, are required to cover charges for services that insured patients received from MD Labs. MD Labs did in fact provide services to physicians treating plan members. But UHC has thus far refused to pay approximately $1 million it owes to MD Labs for admittedly valid claims because it is purporting to "recoup" based on its incorrect audit findings and statistically invalid extrapolation of those findings. UHC's failure to provide payment services ordered by physicians from MD Labs for the treatment of UHC's members was therefore unjust.

93.     UHC's failure to provide reimbursement due to its "recoupment" is detrimental to MD Labs in that MD Labs incurred the costs of providing the services in question—in terms of the cost associated with use and consumption of materials used in that process, expenditure of employee time and effort, and cost of capital—without receiving any payment for those efforts, services, or investments.

94.     It would be inequitable for UHC to retain the benefits of its recoupment to MD Labs' detriment, and MD Labs must be reimbursed for the value of testing provided to plan members.

## COUNT IV
## BAD FAITH

95.     MD Labs incorporates by reference the preceding paragraphs.

96.     UHC's conduct—specifically, "recouping," or denying MD Labs payment for admittedly valid claims, based on incorrect audit findings and statistically invalid extrapolations from those findings; continuing to recoup even after MD Labs appealed the audit findings and pointed out UHC's audit errors and inaccurate sampling and extrapolation methods; denying MD Labs' appeals without further meaningful analysis or explanation; and refusing to disclose UHC's audit workpapers to MD Labs despite MD Labs' repeated requests and CMS rules requiring UHC to maintain such papers—was unreasonable, frivolous and/or unfounded, and therefore constitutes bad faith by an insurer.

97.     As a direct and proximate result of UHC's bad faith, MD Labs has been damaged in an amount to be established at trial and is entitled to recover its actual damages, punitive damages as permitted by law, reasonable attorneys' fees, and actual and statutory litigation costs, including but not limited to expert witness fees.

## COUNT V
## CONVERSION

98.     MD Labs incorporates by reference the preceding paragraphs.

99.     UHC has unlawfully appropriated approximately $1 million of funds it owes to MD Labs (the "Converted Funds") for UHC's own use and benefit in exclusion and defiance of MD Labs' right to those funds.

100.    UHC's intentionally appropriated the Converted Funds by denying MD Labs payment for claims for medically necessary services that MD Labs performed for UHC plan members.

101.    UHC's continued unlawful taking and possession of the Converted Funds has substantially interfered with MD Labs' possession and use of the Converted Funds and denied MD Labs' rights to the Converted Funds.

102.    MD Labs has not consented to UHC's possession and control of the Converted Funds.

103.    As a direct and proximate result of UHC's conversion of the Converted Funds, MD Labs has been damaged in an amount to be established at trial.

## DEMAND FOR JURY TRIAL

104.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, MD Labs demands a trial by jury of the claims at issue in this action, to the extent they constitute claims at law.

## PRAYER FOR RELIEF

**WHEREFORE**, MD Labs demands judgment in its favor against UHC as follows:

A.      Ordering UHC to cease withholding payment from MD Labs on the basis of its so-called "recoupment" stemming from Audit Nos. 20524980 and 13198321;

B.     Ordering UHC to reimburse MD Labs the recoupment it has already unjustly performed, with interest;

C.     Awarding MD Labs damages suffered as a result of UHC's bad faith, as well as punitive damages;

D.     Awarding MD Labs the costs of this action, including reasonable attorneys' fees, pre-judgment interest, and post-judgment interest, in amounts to be determined by the Court; and

E.     Granting such other and further relief as is just and proper.


Dated: June 25, 2021               PERKINS COIE LLP

By   */s/* Adam L. Marchuk
Adam Marchuk (ARDC No. 6281482)
**PERKINS COIE LLP**
131 S. Dearborn Street, Suite 1700
Chicago, IL 60603-5559
(312) 324-8400 (Telephone)
(312) 324-9400 (Facsimile)
Amarchuk@perkinscoie.com

David B. Robbins (application for admission forthcoming)
Matthew P. Gordon (application for admission forthcoming)
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
(206) 359-8000 (Telephone)
(206) 359-9000 (Facsimile)
DRobbins@perkinscoie.com
MGordon@perkinscoie.com

*Attorneys for Plaintiff*
*MD Labs*